UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| FRIENDS OF MERRYMEETING BAY, et al., <br><br> Plaintiffs <br><br> v. <br><br> MILLER HYDRO GROUP, <br><br> Defendant | ) ) ) ) ) ) ) ) ) ) ) ) |  No. 2:11-cv-36-GZS |

### RECOMMENDED DECISION ON MOTION TO DISMISS

The defendant, Miller Hydro Group, moves to dismiss this action arising under the Endangered Species Act ("ESA"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defendant Miller Hydro Group's Motion to Dismiss ("Motion") (Docket No. 7) at 1. I recommend that the court deny the motion.

## I. Applicable Legal Standard

When a defendant moves to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of demonstrating that the court has jurisdiction. *Aversa v. United States,* 99 F.3d 1200, 1209 (1st Cir. 1996). The moving party may use affidavits and other matter to support the motion, while the plaintiff may establish the existence of subject-matter jurisdiction through extra-pleading material. 5B C. Wright & A. Miller, *Federal Practice and Procedure*, § 1350 at 159-60 (3d ed. 2004); *see also Aversa*, 99 F.3d at 1210; *Hawes v. Club Ecuestre el Comandante*, 598 F.2d 698, 699 (1st Cir. 1979) (question of jurisdiction decided on basis of answers to interrogatories, deposition statements, and an affidavit).

With respect to Rule 12(b)(6), as the Supreme Court has clarified:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted).

"In ruling on a motion to dismiss [under Rule 12(b)(6)], a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Id*. "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (citation and internal quotation marks omitted).

## II. Factual Background

The complaint includes the following relevant factual allegations.

Plaintiff Friends of Merrymeeting Bay ("FOMB") is a non-profit Maine corporation dedicated to preserving the ecological, aesthetic, historical, recreational, and commercial values of Maine's Merrymeeting Bay and its watershed, which includes the Androscoggin River. Complaint (Docket No. 1) ¶ 5. Plaintiff Environment Maine is a non-profit Maine corporation that advocates for clean air, clean water, and preservation of Maine's natural resources. *Id*. ¶ 6. The defendant owns and operates the Worumbo dam on the Androscoggin River. *Id*. ¶ 7. The Federal Energy Regulatory Commission ("FERC") licenses the Worumbo dam. *Id*.

The plaintiffs gave the defendant notice of the violations alleged in this complaint more than 60 days prior to the commencement of this lawsuit. *Id.* ¶ 9.

Historically, the Androscoggin River and the Kennebec River, which share a common estuary, Merrymeeting Bay, had the largest Atlantic salmon runs in the United States. *Id.* ¶ 13. Now, according to recent annual surveys done by the Maine Atlantic Salmon Commission, the number of adult Atlantic salmon returning to the Androscoggin River each year is dangerously low. *Id.* The Secretary of Commerce (for endangered species in the ocean) and the Secretary of the Interior (for all other species) are responsible for administering and implementing the ESA, with the National Marine Fisheries Service and the United States Fish and Wildlife Service (collectively, "Services") sharing responsibility for managing the protection of the Atlantic salmon. *Id.* ¶ 15. In 2000, the Services listed the Gulf of Maine Distinct Population Segment of Atlantic salmon as endangered because it is in danger of becoming extinct. *Id.* ¶ 16.

In 2005, FOMB and others filed a petition with the Services asking that the Kennebec, Androscoggin, and Penobscot River salmon populations be included in the description of the endangered population segment. *Id.* ¶ 17. After the petitioners filed suit in May 2008 to obtain a ruling on the petition, the Services ruled on the petition on September 3, 2008, and formally designated the salmon population of those rivers as endangered under the ESA. *Id.* On the same day, the National Marine Fisheries Service issued a final rule designating "critical habitat" for the Kennebec, Androscoggin, and Penobscot salmon. *Id.* ¶ 18. The portion of the Androscoggin River where the Worumbo dam is located is part of that critical habitat. *Id.*

When a federally licensed activity, such as operating a hydroelectric dam, causes a "take" as defined in the ESA, the licensee may receive authorization under the ESA to continue the activity. *Id.* ¶ 22. The licensee may apply for an "incidental take permit" ("ITP") or an

"incidental take statement" ("ITS").  *Id*.  In either case, certain specified conditions must be met.  *Id*.

The Worumbo dam "takes" Atlantic salmon in the following ways, among others: the dam's turbines kill and injure out-migrating salmon when they attempt to pass through them; the dam severely limits upstream passage of salmon, preventing access to significant amounts of spawning and rearing habitat; facilities meant to allow the salmon to pass around or through the dam cause delays in passage, resulting in incremental losses of salmon smolts, pre-spawn adults, and adults; the dam is a barrier to the migration of other fish whose presence is necessary for the salmon to complete their life cycle; the dam adversely alters predator-prey assemblages; the dam creates slow-moving impoundments in formerly free-flowing reaches, making these habitats less suitable for spawning and impairing essential behavior of the salmon; and the dam results in adverse hydrological changes.  *Id*. ¶ 24.

The defendant has neither an ITP nor an ITS authorizing its take of Atlantic salmon at the Worumbo dam.  *Id*. ¶ 25.  The plaintiffs allege that it is, therefore, violating section 9(a)(1)(B) of the ESA.  *Id*.

### III.  Discussion

### A.  Administrative Process

The defendant first argues that the plaintiffs seek to use improperly the citizen suit provision of the ESA.  Motion at 7-12.  The relevant portions of that statute provide:

> (1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf –
> (A)  to enjoin any person, including the United States and any other governmental instrumentality or agency . . . , who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof[.]
> * * *

> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be. . . .
>
> (2)(A)  No action may be commenced under subparagraph (1)(A) of this section –
> (i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;
> (ii)  if the Secretary has commenced action to impose a penalty pursuant to subsection (a) of this section; or
> (iii) if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation.

16 U.S.C. § 1540(g).

In this case, there is no dispute that the administrative process created by regulations promulgated under the ESA has begun. Complaint ¶ 34. The defendant says that the applicable regulations "contemplate a two-stage[] consultation process" that must be completed prior to determining whether the operation of the Worumbo dam requires authorization via an ITS in order to comply with the ESA. Motion at 8. That process is set out in 50 C.F.R. §§ 402.12-402.14.

Those regulations address actions of federal agencies rather than private parties, but, in this case, FERC has designated the defendant to prepare the biological assessment of its licensure of the Worumbo dam under 50 C.F.R. § 404.12. Complaint ¶ 34. The defendant apparently contends that this designation means that a complaint of violation of the ESA brought against the defendant can only be an action brought against FERC itself. Motion at 1-2. It follows, according to the defendant, that the regulatory process must be allowed to play itself out before any private cause of action may be exercised.

However, the plain language of the statute suggests otherwise. It precludes the private cause of action that it creates, 16 U.S.C. § 1540(g)(2), only when the 60-day notice has not been given – not the case here, according to the complaint, Complaint ¶ 9 – or the federal agency has either commenced an action for a civil penalty or a criminal action, neither of which is alleged in the complaint in this case. Nor does the defendant suggest that either action is currently underway. It is perhaps for this reason that the defendant contends that the Supreme Court's opinion in *Bennett v. Spear*, 520 U.S. 154 (1997), requires that "citizens who are dissatisfied with how the ESA is being implemented must await final agency action and then pursue their claims under the Administrative Procedure Act." Motion at 11. I cannot read the opinion to be so limiting. Nor can I read the complaint, construed, as it must be at this stage of the proceedings, with all reasonable inferences drawn in favor of the plaintiff, *Alternative Energy*, 267 F.3d at 33, necessarily to allege only "dissatisf[action] with how the ESA is being implemented." *Id.*

In *Bennett*, the question was the standing of the citizen plaintiffs under the ESA to challenge a biological opinion issued by the Fish and Wildlife Service. 520 U.S. at 157. After concluding that the plaintiffs did have standing under the ESA, the Supreme Court moved on to other grounds advanced by the government to support the trial court's dismissal of the action. *Id.* at 166. It held that the word "violation" in section 1540(g)(1)(A) "cannot be interpreted to include the Secretary's maladministration of the ESA. Petitioners' claims are not subject to judicial review under § 1540(g)(1)(A)." *Id.* at 174. Nothing in the opinion suggests that a claim may not be brought under section 1540(g)(1)(A) against a non-governmental defendant.

The complaint, after all, names only Miller Hydro Group as a defendant. The violation of the ESA that is alleged is a violation by Miller Hydro Group. Complaint ¶¶ 14-26. It does not

6

seek relief that can only be provided by FERC or any other government agency or service that might be involved. Contrary to the defendant's contention, Motion at 12, the complaint cannot reasonably be read to "attempt to compel the Court to step into the Federal Agencies' handling of an ongoing process that administers or implements the ESA."[1]

The First Circuit's recent opinion in *Animal Welfare Inst. v. Martin*, 623 F.3d 19 (1st Cir. 2010), decided thirteen years after *Bennett*, governs on this issue. Construing the ESA, the First Circuit wrote:

> Nothing in the statutory language about ITPs constrains the power of the federal judiciary. Similarly, nothing in the citizen suit provision purports to subordinate judicial remedies to the ITP process. The provision simply states that "[t]he district courts shall have jurisdiction . . . to enforce any . . . provision or regulation, or to order the Secretary to perform such act or duty," at issue in a citizen suit. 16 U.S.C. § 1540(g)(1). There is no reason to think that while Congress intended for FWS to consider the facts as to whether species-wide harm would be done before it can issue an ITP, it intended to preclude a federal judge from considering the same facts.

*Id*. at 28-29. *See also Strahan v. Roughead*, C.A. No. 08-cv-10919-MLW, 2010 WL 4827880, at *7 (D. Mass. Nov. 22, 2010) (distinguishing *Bennett* on this basis); *Loggerhead Turtle v. County Council of Volusia County*, 896 F. Supp. 1170, 1177 (M.D.Fla. 1995) ("[T]he Court is not divested of jurisdiction over this case simply because the County has filed an application for an incidental taking permit. While the County may receive such a permit in the future, the pendency of the permit application is irrelevant to the question of whether or not the County's activities will result in the taking of a protected species tomorrow.").

The defendant is not entitled to dismissal on this basis.

---

[1] The only other case that the defendant cites for this point, *Earth Island Inst. v. Albright*, 147 F.3d 1352 (Fed. Cir. 1998), provides no more support for the defendant's position than does *Bennett*.

### B. Ripeness

The defendant next argues that the plaintiffs' claims as set out in the complaint are not ripe for adjudication. Motion at 13-15. The First Circuit has said of the ripeness doctrine:

> Its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. Courts must apply a two-part test to assess ripeness. First, it is necessary to determine whether the issue presented is fit for judicial review – an inquiry that typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends on facts that may not yet be sufficiently developed. Second, it is necessary to evaluate the extent to which withholding judgment will impose hardship – an inquiry that typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties. Both prongs of the test ordinarily must be satisfied, although a very strong showing on one axis may compensate for a relatively weak showing on the other.

*Stern v. United States Dist. Ct.*, 214 F.3d 4, 10 (1st Cir. 2000) (citations and internal quotation marks omitted).

On the first axis, the defendant asserts that "a determination in the consultation process that Miller Hydro's operations do not constitute a violation of the ESA would render moot Plaintiffs' request that the Court declare Miller Hydro to be in violation of the ESA's take prohibition." Motion at 14. But, as the *Loggerhead* court noted, whether a permit is issued in the future is irrelevant to the question of whether a remediable violation is taking place at the present time. 896 F.Supp. at 1177. Issuance of a permit at some undetermined time in the future will have no effect on the alleged violation that is currently occurring and, by its very nature, is likely to have increased harmful effects in the interim. Whether a statutory violation is taking place now is not dependent on facts that have not yet been sufficiently developed. If the government's eventual action is inconsistent with the court's finding in this case, that discrepancy will have to be resolved when it arises. Speculation that it might arise is not a

reason to defer this court's consideration of a possible current violation of a federal statute. *Animal Prot. Inst. v. Holsten*, 541 F.Supp.2d 1073, 1077 (D. Minn. 2008).[2]

With respect to the second axis, the defendant asserts that the plaintiffs "cannot establish that they would suffer hardship if the Court were to withhold judgment." Motion at 14. However, it is not the plaintiffs who would suffer hardship as a result of delay. The basis of this action is alleged damage to the declining Atlantic salmon population, and it is the hardship to that endangered species that is the proper focus of this portion of the ripeness inquiry. The evidence on this point is uniform; the plaintiffs allege that further delay could cause extinction of the species as a result of the alleged taking. Complaint ¶ 26. Nothing more need be shown at this stage.

There is no sense in which the disagreement between the parties set forth in the complaint is "abstract." It is instead quite concrete. The defendant is not entitled to dismissal on the ground of lack of ripeness.

### C. Stay or Abstention

Finally, the defendant asserts that, should the court decide not to dismiss this action, it should decline to exercise its jurisdiction "at least pending resolution of the administrative process now underway" pursuant to its inherent authority or the doctrine of primary jurisdiction. Motion at 15-17. It relies solely on *I Ka'aina* as authority for its asserted entitlement to a stay, but, in that case, final agency action was expected within three months, while in this case there is no suggestion of a date when resolution of the taking issue will come from FERC, if at all.

---

[2] The defendant cites *I Ka'aina v. Kaua'i Island Util. Coop.*, Civ. No. 10-00169 ACK-LEK, 2010 WL 3834999 (D. Haw. Sept. 24, 2010), for the proposition that a suit filed during pending application for an ITP would be rendered moot if the regulatory process were complete and an ITP were issued. Motion at 14. In that case, the court granted a stay of a citizens' suit under ESA where the permit process could be completed within next three months. *Id.* at *8. While a stay has been requested here, *see* Section III.C below, no evidence of the likely date of resolution of the ITP process in this case has been offered, although I note that it is still apparently in the very early, informal consultation stage, making a rapid resolution unlikely.

Indeed, the administrative process is still in its initial, informal consultation stage, making the likely date of completion of the process years rather than months away. A stay is not indicated in this case at this time. *See, e.g., Amersham Int'l v. Corning Glass Works*, 108 F.R.D. 71, 72 (D. Mass. 1985) (when danger that stay will damage other party exists, stay available only when seeking party demonstrates hardship).

The primary jurisdiction doctrine "counsels abstention whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 30 n.13 (1st Cir. 2011) (citation and internal quotation marks omitted). In this case, however, the ESA does not place the ITP and ITS process within the administrative control of a single agency; instead, it charges the Secretaries of the Treasury, of the Interior, and of the Department in which the Coast Guard was operating at the relevant time, jointly to formulate implementing regulations. 16 U.S.C. §§ 1532(15), 1540(f). In addition, it is FERC, the licensing agency in this case, that is responsible for implementing the administrative process. Complaint ¶¶ 32-34.

In a case, in which the defendant invoked the doctrine, brought under the Resource Conservation and Recovery Act, the First Circuit observed that circumstances justifying a federal court's abstention when a citizen's suit is brought as authorized by a federal statute "will be exceedingly rare." *Chico*, 633 F.3d at 31-32. The defendant has not even attempted to identify any rare circumstances that would justify abstention here. In a case brought under the Clean Air Act where the defendant made similar arguments, the court held that "to delay citizen enforcement would frustrate Congress's intent, as evidenced by its provisions for citizen suits, to facilitate broad enforcement of environmental-protections laws and regulations." *St. Bernard*

*Citizens for Envtl. Quality, Inc. v. Chalmette Refining, L.L.C.*, 348 F.Supp.2d 765, 766, 768 (E.D. La. 2004).

In a case very similar on its facts to the instant case, a federal district court judge wrote the following about a defendant's invocation of the doctrine of primary jurisdiction:

> Although the court agrees with [the defendant's] belief that findings made by the FWS and NMFS during the [Habitat Conservation Plan] process will affect whether an ITP is ultimately issued to [the defendant], the pendency of [the defendant's] ITP application is not relevant to whether [its] timber harvesting operations have resulted or will imminently result in the "take" of coho salmon in the watersheds at issue in this action. The HCP approval process requires NMFS and FWS to determine the extent of the impact on coho salmon resulting from the issuance of an ITP, whether the steps taken by [the defendant] to minimize and mitigate such impacts are sufficient, and whether continued logging operations will reduce the likelihood of the survival and recovery of coho salmon. *See* 16 U.S.C. § 1539(a)(2). In contrast, enforcement of the ESA's prohibition against the "take" of endangered or threatened species has been placed squarely within the jurisdiction of the courts through the ESA's citizen-suit provisions. In determining whether a take of coho salmon has occurred or is likely to occur, the court will not be called upon to determine the best strategy for conserving and restoring the coho salmon population in the rivers of northern California. Rather, the court must only decide whether [the defendant's] logging operations have resulted in a take of or will cause imminent harm to coho salmon in the watersheds at issue. As noted by the *Loggerhead Turtle* court, there is no "invasion" of the expertise of the Secretary of the Interior and the court need not entangle itself in a premature review of the Secretary's decision to issue an ITP.

*Coho Salmon v. Pacific Lumber Co.*, 61 F.Supp.2d 1001, 1015-16 (N.D.Cal. 1999) (case citations and internal quotation marks omitted). Thus, "[i]n the instant action, there is no potential for conflicting decisions between the court and the decisions of NMFS and FWS, nor would the court's determination of whether a take has occurred conflict with the Secretary's decision to issue an ITP." *Id*. at 1016. That reasoning applies here.

The request that the court stay this action or abstain from deciding it under the doctrine of primary jurisdiction should be denied.

## IV. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to dismiss be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 14th day of July, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge