## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| FRIENDS OF MERRYMEETING BAY, et al., | ) ) |
| | ) |
| Plaintiffs, | ) |
| | )   Docket no. 2:11-cv-36-GZS |
| v. | ) |
| | ) |
| MILLER HYDRO GROUP, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON RENEWED MOTION TO DISMISS

Before the Court is Defendant Miller Hydro Group's Renewed Motion To Dismiss (ECF No. 104) ("Renewed Motion To Dismiss").[1]   As explained herein, the Court GRANTS Defendant's Renewed Motion To Dismiss (ECF No. 104) on mootness grounds.

## I.   LEGAL STANDARD

The Constitution confines the federal courts' jurisdiction to actual cases or controversies. U.S. Const. art. III, § 2, cl. 1.  An actual case or controversy must exist "at each and every stage of the litigation."  Connectu LLC v. Zuckerberg, 522 F.3d 82, 88 (1st Cir. 2008).  Litigation becomes moot when an actual case or controversy ceases to exist because "the issues presented are no longer live or . . . the parties lack a legally cognizable interest in the outcome."  Overseas Military Sales Corp. v. Giralt-Armada, 503 F.3d 12, 17 (1st Cir. 2007) (internal quotation omitted).  "If an event occurs while a case is pending that heals the injury and only prospective relief has been sought, the case must be dismissed."  Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir. 1997); see also Cruz v. Farquharson, 252 F.3d 530, 533 (1st

---

[1]  The Court acknowledges receipt of Plaintiffs' Notice Of Recent Authority Relevant To Defendants' Renewed Motion To Dismiss (ECF No. 109).

Cir. 2001) (stating that once a case becomes moot, dismissal is "compulsory").  However, a party asserting that a case should be dismissed as moot bears a heavy burden in showing that "it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 66 (1987) (quoting United States v. Phosphate Export Ass., Inc., 393 U.S. 199, 203 (1968)) (alteration in original).

Closely related to Article III mootness is "prudential mootness" arising from a court's ability to exercise discretion not to grant relief.  Even where a case may not be moot in the strict Article III sense, a case may become "so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant."  Chamber of Commerce of U.S. of Am. v. U.S. Dept. of Energy, 627 F.2d 289, 291 (D.C. Cir. 1980).  As with Article III mootness, the inquiry under prudential mootness becomes whether "circumstances [have] changed since the beginning of the litigation that forestall any occasion for meaningful relief."  Southern Utah Wilderness Alliance, 110 F.3d at 727.

The First Circuit has observed that it is appropriate to consider mootness challenges as challenges to a court's subject-matter jurisdiction, and that "[t]he proper vehicle for challenging a court's subject-matter jurisdiction is Federal Rule of Civil Procedure 12(b)(1)."  Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001); see United Seniors Ass'n v. Philip Morris USA, 500 F.3d 19, 23 (1st Cir. 2007).  While there are different types of attacks on subject matter jurisdiction under Rule 12(b)(1), because the parties here do not challenge the authenticity nor the admissibility of the National Marine Fisheries Service Endangered Species Act Biological Opinion ("Biological Opinion" or "BO") and the accompanying Incidental Take Statement ("ITS") (ECF No. 104-1), the basis for and the documents considered by the Court

under the mootness challenge, the procedure for the Court's analysis would not differ materially under either type of attack.  See, e.g., Williamson v. Tucker, 645 F.2d 404, 412-15 (5th Cir. 1981) (cited approvingly in Valentin, 254 F.3d at 364 and providing the different levels of review in which a court may engage when evaluating a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)).

## II.   THE ENDANGERED SPECIES ACT

Congress has declared that the purpose of the Endangered Species Act ("ESA") is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  Accordingly, when it was passed, the ESA represented "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).  Under the ESA, "[v]irtually all dealings with endangered species, including taking, possession, transportation, and sale, were prohibited, except in extremely narrow circumstances."  Id. (internal citations omitted).  To further the protection afforded by the ESA, the statute includes a citizen suit provision, allowing interested persons to bring suit to force compliance with the ESA. Id. at 180-81; see also 16 U.S.C. § 1540(g).

Section 9 of the ESA makes it unlawful for any person to "take" any threatened or endangered species of fish or wildlife within the United States, unless an incidental take statement is obtained pursuant to the consultation process in Section 7 of the ESA.[2]  16 U.S.C. §§ 1536, 1538.  If during the consultation process, the agency determines that an action is not likely to jeopardize the species, but is reasonably certain to result in the incidental take of a listed

---

[2]  Although not material to this case, the ESA also provides for incidental take permits under section 10 of the ESA. See 16 U.S.C. § 1539.

species, the agency provides an incidental take statement along with a biological opinion.  See 16 U.S.C. § 1536(a)(2).  An incidental take statement must specify the impact of the incidental taking on the species and "those reasonable and prudent measures that [the agency] considers necessary or appropriate to minimize such impact."  Id. § 1536(b)(4)(i)-(iv).  Further, an incidental take statement must "set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the [reasonable and prudent measures]."  Id. § 1536(b)(4)(iv).  Finally, Section 7(o)(2) of the ESA states that "any taking that is in compliance with the terms and conditions specified in a written [incidental take] statement . . . shall not be considered to be a prohibited taking of the species concerned."  Id. § 1536(o)(2).  Accordingly, an incidental take statement constitutes authorization for a person to "take" an endangered species so long as the "take" is done in accordance with the "terms and conditions" specified by the agency.

## III.   BACKGROUND

In 2000, the National Marine Fisheries Service ("NMFS") and the United States Fish and Wildlife Service ("USFWS") (collectively, the "Services") issued a rule listing the Gulf of Maine Distinct Population Segment ("GOM DPS") of Atlantic salmon endangered under the ESA. (Complaint (ECF No. 1) ¶ 16.)  On June 19, 2009, the Services issued a final rule including the Atlantic salmon populations of the Kennebec, Androscoggin and Penobscot Rivers in the GOM DPS, thereby formally designating those populations of Atlantic salmon as endangered under the ESA.  (Id. ¶ 17.)  In their Complaint, Plaintiffs Friends of Merrymeeting Bay and Environment Maine allege that the Kennebec and Androscoggin Rivers historically had the largest Atlantic salmon runs in the United States, estimated at more than 100,000 adults each year.  (Id. ¶ 13.)

Now, the numbers of adult Atlantic salmon returning to these rivers is perilously low.  (Id.)  For example, in 2010, only ten adult Atlantic salmon returned to the Androscoggin River.  (Id.)

Defendant Miller Hydro Group ("Miller Hydro") owns, operates and holds the Federal Energy Regulatory Commission ("FERC") license for the Worumbo hydroelectric dam (the "Worumbo Project") located on the Androscoggin River.  (Id. ¶ 7.)  In their Complaint, Plaintiffs allege that the Worumbo Project kills, harms and harasses endangered Atlantic salmon in numerous ways:  the dam kills and injures Atlantic salmon when the fish pass through the turbines; the dam impedes upstream and downstream fish passage, which in turn prevents those Atlantic salmon from accessing spawning and rearing habitat; and, the dam alters the natural habitat of Atlantic salmon to the point that the essential behavior patterns of the fish are impaired, among other negative consequences.  (Id. ¶ 1.)  Plaintiffs claim that Miller Hydro is violating the ESA by killing, harming and harassing Atlantic salmon through the operation of the Worumbo Project.  (Id. ¶¶ 1, 24-25.)

Plaintiffs filed their Complaint (ECF No. 1) on January 31, 2011 against Miller Hydro asserting a cause of action under the Endangered Species Act.  Specifically, Plaintiffs claim that Miller Hydro is currently taking endangered Atlantic salmon through the operation of the Worumbo Project in violation of the ESA.  Plaintiffs further allege that Miller Hydro "has neither an incidental take permit nor an incidental take statement authorizing its take of Atlantic salmon at [the] Worumbo [Project]."  (Compl. ¶ 25.)

In response to the alleged violations of the ESA, Plaintiffs request that the Court "[d]eclare Defendant to be violating the take prohibition of" the ESA.  (Id. Relief Requested ¶ a.)  Plaintiffs also request that Miller Hydro be ordered to: (1) adhere to a specified schedule in preparing a biological assessment, a first step in obtaining an incidental take statement, (2)

"prevent Atlantic salmon from swimming into operating turbines at [the] Worumbo [Project] unless authorized by an ITP or ITS," and (3) "implement other appropriate measures to comply with the ESA's take prohibition pending the issuance of any ITP or ITS." (Id. Relief Requested ¶ b.).

Prior to Plaintiffs' filing of this case, Miller Hydro began the process of working in consultation with the Services and FERC toward the obtainment of an incidental take statement pursuant to Section 7 of the ESA.[3] (Biological Opinion at 3.) On October 18, 2012, the ESA consultation process for the Worumbo Project concluded with the NMFS's issuance of a Biological Opinion ("BO") that included the ITS. The BO is "based on a review of the best available scientific and commercial information." (Id. at 5.) After over seventy pages of analysis and review, the BO concludes that operation of the Worumbo Project pursuant to the interim species protection plan, "may adversely affect but is not likely to jeopardize the continued existence of the GOM DPS of Atlantic salmon."[4] (Id. at 73.)

The BO contains the ITS for the Worumbo Project, which authorizes a specific level of Atlantic salmon takings at the Worumbo Project and exempts those takings from liability under the ESA. (Id. at 73-77.) Under the ITS, Miller Hydro will be required to implement "reasonable and prudent measures" to "minimize and monitor" the incidental taking of Atlantic salmon at the

---

[3] Specifically, on July 14, 2010, Miller Hydro was designated as the non-federal representative for the purpose of informal consultation under the ESA, and, on December 22, 2011, Miller Hydro submitted a preliminary draft biological assessment ("BA"). (Biological Opinion at 3-5.) On May 14, 2012, the draft BA was filed with FERC. (Id. at 5.)

[4] The BO includes authorization of an interim species protection plan ("ISPP"). (Biological Opinion at 11.) Under the ISPP, Miller Hydro will be required to: "(1) Conduct upstream passage studies on pre-spawn adult Atlantic salmon; (2) Conduct downstream survival studies for outmigrating smolts and kelts; (3) Conduct a study of smolt predation." (Id.) During this period, information gained regarding the survival levels necessary to recover the Atlantic salmon will be used to develop long-term protection measures. (Id. at 11.) The ISPP is designed to be adaptive. Accordingly, if early study results "indicate that the study design is not adequately measuring passage efficiency, Miller Hydro will work with NMFS to correct it." (Id. at 12.) Under the ISPP, Miller Hydro will meet with NMFS annually to discuss study results and potential modifications to the ISPP and the Worumbo Project. (Id.)

dam.  (Id. at 76.)  The measures include annual monitoring and reporting "to confirm that Miller

Hydro is minimizing incidental tak[ings] and reporting all project-related observations of dead or

injured salmon to NMFS."  (Id. at 76.)  The ITS also contains specific terms and conditions that

must be followed for Miller Hydro to be exempt from the takings prohibitions of the ESA.  (Id.

at 76-77.)  If the level of incidental taking is exceeded, agency consultation will be reinitiated

and the reasonable and prudent measures will be reviewed.  (Id. at 77.)

Based on the BO and ITS, Miller Hydro moved to dismiss the Complaint as moot.  Miller

Hydro asserts that the issuance of the ITS, exempting operations at the Worumbo Project from

liability under the ESA, renders Plaintiffs' claims under the ESA moot.  Plaintiffs have opposed

that motion, arguing that despite the issuance of the BO and ITS, a live case or controversy

remains before the Court.

## IV.    DISCUSSION

The Court readily concludes that Miller Hydro has met its heavy burden of showing

mootness in conjunction with Plaintiffs' claims for injunctive and declaratory relief under the

Endangered Species Act.  Plaintiffs' Complaint is predicated on the allegation that Miller Hydro

does not have an ITS.  (See Compl. ¶ 25 ("Miller Hydro has neither an incidental take permit nor

an incidental take statement authorizing its take of Atlantic salmon at [the] Worumbo

[Project].").)  This foundational fact changed when NMFS issued its BO and ITS on October 18,

2012 and fundamentally altered the circumstances of this litigation.

The ITS issued by NMFS exempts from liability any taking of Atlantic salmon that is in

accord with the ITS from the issuance of the ITS to 2016.  (Biological Opinion at 73-77.)  See

also Ramsey v. Kantor, 96 F.3d 434, 441 (9th Cir. 1996) (providing that Section 7(o) "indicates

that any taking-whether by a federal agency, private applicant, or other party-that complies with

the conditions set forth in the incidental take statement is permitted.")   Plaintiffs even acknowledged in their Complaint that the issuance of an incidental take statement would exempt Miller Hydro from liability under the ESA.  (See Compl. ¶ 2 ("The ESA allows the [NMFS] and [USFWS], under certain circumstances, to authorize an otherwise prohibited taking of an endangered species if such taking is 'incidental' to, and not the purpose of, the carrying out of an otherwise lawful activity."); see also Pls.' Opp'n To Miller Hydro's Renewed Mot. To Dismiss (ECF No. 105) at 5 ("Miller Hydro will be insulated from *future* ESA liability for such takes for the four-year life of the ITS, *so long as it complies with those conditions*.") (alterations in original).)  Case law confirms that the issuance of the ITS renders Plaintiffs' ESA claim moot. See Oregon Wild v. Connor, No. 6:09-CV-00185-AA, 2012 WL 3756327 at **2-3 (D. Or. Aug. 27, 2012) (declaring claims under Section 9 of the ESA moot because "[t]he actions challenged by plaintiff in its second claim for relief have been explicitly authorized by NMFS under Section 7, and are no longer even allegedly 'wrongful.'); Oregon Natural Res. Council v. Bureau of Reclamation, No. 91-6284-HO, U.S. Dist. LEXIS 7418 at **24-25 (D. Or. April 5, 1993) (stating that "FWS's issuance of the biological opinion on the long-term operation of the Project, and the adoption of that opinion by the Bureau, moots plaintiffs' ESA claims."); Southern Utah Wilderness Alliance v. Madigan, No. 92-1094-LFO, 1993 WL 19650 at *1 (D.D.C. Jan. 6, 1993) (dismissing as moot claims under ESA Section 9 because the Fish and Wildlife Service issued incidental take statements along with its biological opinion).[5]

---

[5]  Notably, in Oregon Wild, the plaintiff cited U.S. Public Interest Research Group v. Atlantic Salmon of Maine, LLC, 339 F.3d 23 (1st Cir. 2003), in arguing that its case was not moot because the court could either order relief to remediate alleged past takings or enter an order mandating compliance with the incidental take statement.  Pl.'s Resp. in Opp'n to Def.'s Mot. for J. on the Pleadings at 10-11, Oregon Wild v. Connor, 2012 WL 37563273 (D. Or. June 29, 2012) (No. 6:09-CV-00185-AA) (arguing that "based on the likely past takes that have occurred for at least the last six months, the court could effect either of the following remedies" and describing the two above mentioned remedies). The court nonetheless found plaintiff's ESA claim moot.  See Oregon Wild, 2012 WL 3756327 at *3 (D. Or. Aug. 27, 2012).

Plaintiffs' request for injunctive relief is similarly based on now outdated facts.  First, Plaintiffs request that the Court order Miller Hydro to prepare a BA according to a specified schedule.  (Compl. Requested Relief ¶ b.)  On May 14, 2012, Miller Hydro's draft BA was filed with FERC.  (Biological Opinion at 5.)  Second, Plaintiffs request that the Court order Miller Hydro to "prevent Atlantic salmon from swimming into operating turbines at [the] Worumbo [Project] *unless authorized by an ITP or ITS*" and to "implement other appropriate measures to comply with the ESA's take prohibition *pending the issuance of any ITP or ITS*."  (Compl. Requested Relief ¶ b (emphasis added).)  Miller Hydro now has a valid ITS based on the "best available scientific and commercial information" that contains "reasonable and prudent measures" designed to minimize and monitor the incidental taking of Atlantic salmon at the Worumbo Project.  (Biological Opinion at 5, 76.)  In the Complaint, Plaintiffs request only prospective relief and that requested relief has been provided through the issuance of the BO and ITS.  Therefore, Plaintiffs' request for injunctive relief is now moot.  For the same reasons that injunctive relief is not available, a declaratory judgment is also not available.

Moreover, the core of Plaintiffs' complaint is that Atlantic salmon, an endangered species, are being taken at the Worumbo Project without an incidental take statement in violation of the ESA.  Plaintiffs' claimed injury has been healed by the issuance of the ITS.  There is no grievance left in the Complaint for the Court to remedy.  Therefore, the issuance of the BO and ITS resolves Plaintiffs' injury, renders Plaintiffs' ESA claim moot and "forestall[s] any occasion for meaningful relief."  <u>Southern Utah Wilderness Alliance</u>, 110 F.3d at 727.

Plaintiffs advance two arguments in an attempt to keep their ESA claim alive.  First, Plaintiffs assert that the Court could award injunctive relief to remedy past alleged takings of Atlantic salmon at the Worumbo Project.  Specifically, Plaintiffs ask the Court to order Miller

9

Hydro to take steps beyond those in the ITS in order to "offset the harm caused by [Miller Hydro's] unlawful takes of Atlantic salmon during the 2009 through 2012 migration seasons . . . to reduce the harm to salmon during future migration seasons." (Pls.' Opp' to Miller Hydro's Renewed Mot. To Dismiss at 10.) In support of this argument, Plaintiffs point to U.S. Public Interest Research Group v. Atlantic Salmon of Maine, LLC, 339 F.3d 23 (1st Cir. 2003), where *after* the district court issued an injunction to remedy violations of the Clean Water Act, the Maine Board of Environmental Protection issued a permit for the challenged activity that had less stringent requirements than the injunction issued by the district court. Id. at 27. In upholding the injunction, the First Circuit stated, "the court may grant additional injunctive relief governing the post-permit operations of the companies *insofar as the court is remedying harm caused by their past violations*." Id. at 31 (alteration in original). Here, Plaintiffs ask the Court to follow Atlantic Salmon and grant injunctive relief to remedy alleged past violations of the ESA.

Even assuming that the Worumbo Project did take Atlantic salmon in violation of the ESA prior to the issuance of the ITS and that the Court retained jurisdiction over an ESA claim that occurred wholly in the past, the Court would decline to issue further injunctive relief. In Atlantic Salmon, at the time the district court issued the injunction, the permit had not yet been issued. 339 F.3d at 27. That is not the case here. Instead, the Court has before it an extensive Biological Opinion "based on a review of the best available scientific and commercial information." (Biological Opinion at 5.) Contained within the BO and the ITS are "reasonable and prudent measures [that] are necessary and appropriate to minimize and monitor incidental take of Atlantic salmon." (Id. at 76.) In this situation, the Court defers to a coordinate branch of

government and its well-researched and reasoned conclusions.  Accordingly, even assuming the Court has jurisdiction, the Court stays its hand and declines to issue injunctive relief.

Second, Plaintiffs argue that Miller Hydro may not comply with the conditions in the ITS.  However, an alleged failure to comply with the terms of the ITS is not the case before the Court.  Instead, the Complaint repeatedly states that Miller Hydro does not have an ITS or ITP authorizing the alleged taking of Atlantic salmon in violation of the ESA.  (See Compl. ¶¶ 2, 25, 34, Requested Relief ¶ b.)  Following issuance of the ITS, Plaintiffs have not moved to amend their Complaint to state a claim for relief in view of the newly issued ITS.  Accordingly, there is no claim that would provide a basis for relief for violation of the ITS in Plaintiffs' Complaint.

Moreover, should Miller Hydro fail to follow the terms of the ITS, including if Miller Hydro exceeds the authorized amount of takings of Atlantic salmon, then certain provisions contained within the ITS itself are invoked.  For example, "[i]f, during the course of the action, the level of incidental take is exceeded, reinitiation of consultation and review of the reasonable and prudent measures are required."  (Biological Opinion at 76.)  The ITS also contains an annual monitoring and reporting program "to confirm that Miller Hydro is minimizing incidental tak[ing] and reporting all project-related observations of dead or injured salmon to NMFS."  (Id.) Since before Plaintiffs filed this action, Miller Hydro has diligently attempted to comply with the requirements and process for obtaining an ITS.  (See, e.g., Biological Opinion at 3-5; see id. at 12-13 (stating that "[b]y filing the BA and ISPP with FERC absent any proposed federal action at the Worumbo Project, Miller Hydro is being proactive in conducting section 7 consultation for the protection of listed Atlantic salmon.")  Miller Hydro's actions and the existence of an ITS render Plaintiffs' ESA claim moot.  Because Plaintiffs' Complaint has become moot, dismissal is

"compulsory."  See Cruz, 252 F.3d at 533.  Therefore, Plaintiffs' ESA claim is DISMISSED WITH PREJUDICE.

**VI.     CONCLUSION**

For the reasons explained herein, Miller Hydro's Renewed Motion To Dismiss (ECF No. 104) is GRANTED.  Additionally, because Plaintiffs' sole claim is dismissed with prejudice, the summary judgment motion (ECF No. 85) and motions in limine (ECF Nos. 80, 81, 82 and 83) are DISMISSED AS MOOT.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 14th day of January, 2013.